Patricia Vercelli, Senior Vice President and General Counsel, and Doug Mullen, Vice President and Deputy General Counsel. The airlines that serve Portland International Airport want the FAA and the airport to comply with the statutory requirement that revenues generated by federally funded airports must be spent on airport operations and capital projects. Unfortunately, the FAA decision that brings us here today allows millions of dollars each year in airport revenues to leave the airport for projects that are completely external to the airport. The first project is a stormwater maintenance on nearly 5,000 lane miles of roadways throughout the city of Portland, Oregon, but none of those lanes or roadways are actually within the airport property. There's also a Superfund cleanup site nine miles from the airport, a very large one on a river having nothing to do with the airport. Do you see anything in the statute that limits expenditures to activities on the airport ground? That's the only interpretation we would maintain, Your Honor, Judge Tatel, with regard to 47107K2A, which requires that the payments reflect the value of services and facilities provided to the airport. I saw that in your brief, but could you start with 107B instead, please? Sure. Because there's a provision in K2 that has an exception for B, and it seems to me that, or let me ask you this, if it were authorized under B, then we wouldn't have to think about K2 at all, right? Because if it's authorized under B, it can't be a diversion under K2. We wouldn't agree with that, Your Honor, for the following reasons. You wouldn't? No. I'm sorry? You do agree or don't? We do not agree with the premise of your question for the following reasons. 47107B was part of four statutes that Congress has legislated in this area. So that one comes out in 1982. That's the original statute. And that says, basically, it has to be an operating cost or a capital cost of the airport. So we get to 1987, Congress has to get involved again, and this time they add fuel, which is a part of this case. That gets added. In 1994, Congress is frustrated because revenue diversion is continuing, and that's when they add 47107K. And that's the one where they say, you need to come up FAA, you're not policing this, you need to actually do a policy. And that policy needs to tell exactly what it is to make sure the revenues aren't diverted. And that language that brings us here today to reflect the value of services and facilities provided to the airport was in the 1994 legislation. That was added at that time. And what they said was, specifically, and this is under K, not later than 90 days after August 23, 1994, you need to put out, you being FAA, policies and procedures to ensure the prompt and effective enforcement of A13 and B. So they're telling FAA, you haven't done enough, we're going to tell you what you need to do. And the first item they say is, your new policy, which we need this year, needs to provide no payment, direct or indirect, unless it reflects the value of services and facilities provided to the airport. Now, with regard... But it has an exception for subparagraph B in it. For three things, Your Honor. Doesn't it? Yes. Okay, so can we go back to B? Sure. So just assume hypothetically, just stick with my question for a minute. Explain to me why these payments aren't, these expenditures aren't authorized under B as they're expended for the capital operating costs of A, the airport, and the agency's revenue use manual and compliance manual all define operating expenses as utility payments. The language of the statute, Your Honor, of course, says operating costs of the airport. Right. We do submit, part of our argument is that when you pay for stormwater outside the airport and a Superfund nine miles from the airport, especially given that the airport handles its own stormwater and pays for that, that we're not dealing with an operating cost. Well, but the agency has made findings that you didn't challenge that the airport benefits from these expenses. We definitely challenge that, Your Honor. With evidence? I know you challenged them in your brief, but is there any evidence in the record that is contrary? Well, our view is that the FAA has to have substantial evidence in the record to show that there's value provided to the airport. And they haven't done that. There is no value that's been shown. Well, there's two items of value they suggest, and I can address both of those items as to why that can't be the case. Why don't you address those, too? Sure. So, first of all, they say there's some general benefit that's received because the roadways will not be clogged. We think that this is very tenuated. It's very speculative. Why? Because we're talking about 145 square miles of roadways all throughout the city of Portland, and to say that somehow if you don't do the stormwater, you're not going to be able to get to the airport just seems very attenuated. Well, the finding is you can't get to the airport, I suppose, unless you have a little private helicopter, except by these roads. There's no evidence in the record that the water has caused that type of situation to occur. Well, there's also the problem that, you know, where do you draw the line? They could say the same thing about traffic signs and road repair and police and fire and, you know, so the airport could wind up being charged for all kinds of things that has nothing to do with passenger flights. We agree entirely. I just ran off on smiling because I had a list, and I think you checked off most of my examples. Police throughout the city, that could be part of this. The fire department, houses burn down. Fires, we know from the terrible things on the West Coast, they fly around. So do we take care of the fires with airport costs? Trash. Well, but the record shows that these costs are allocated, all right, and by a method that is a generally accepted method. And I think at one point, I think you acknowledged that the airport covers, what, 3,000 miles? 3,000 acres? Excuse me. And basically, it's paying its proportional share of these utility costs and police and fire. It's not paying for all the police and all the firemen. The police and fire are just a hypothetical. They're not part of this case. Right, sure. And so that's just a false suggestion. Well, that's a tax, Your Honor. What we're saying is, and this has to be a fee. This is not a tax. It's a fee that's being charged, a utility fee. And the reason why it's unlawful in this case, maybe not for other industries, is because Congress in 1994 was very direct that the payments have to reflect the value of services and facilities provided to the airport. So the airport is willing to operate without any stormwater? That's a great question, Your Honor. I'm glad you raised it. The record is clear. The airport has plenty of stormwater, and they take care of all of it, and they pay a separate governmental entity. It's the Multnomah District Drainage District. Yes, and it's like the city gets credit for, or rather the port gets credit. But what I'm trying to understand is, is your position that the airport, as a resident of the city of Portland, has no responsibility as a resident to contribute its proportional share for the basic utilities that the airport itself is using? No, that is not our position. We pay electricity. We pay for sewer. So if the city has to dig up the ground and reroute its electrical lines and things like that, is it the airport's position that it shouldn't have to pay for maintenance and upgrading? There are various scenarios, Your Honor, which could be different. I'm pushing you to see how far. I mean, that's the point. You talk about building a sports stadium and all that. We're not there, all right? And so that's sort of the notion of the extreme statement that you have quoted several times from the House Committee report. But here we're dealing with basic utilities. But there's a division, Your Honor, with all respect. On the one hand, we have water and sewer, which we pay for. Everybody knows. And then there's stormwater on the airport, which we pay for completely. So if people can't get to the airport except by helicopter, that's okay with you? Well, no. But we think that that is a parade of horribles that's put out there. It's no different than Judge Randolph referring— What about all the snow that's out there now? That's on the city and their taxpayers. That's what they do. I know. And so if the city says we can't afford it and they just stop doing it, the airport doesn't care? No, but the reason why this law was passed was because airports were the piggy bank. And Congress went back three times to change the law because the FAA wasn't enforcing it. But what I'm trying to get at is it's one thing if they're building a new football stadium with this money. Or maybe you don't think it's different. And it's another thing if they are maintaining basic services that the airport needs. I think it's too much of a stretch to say that basic services for the airport includes 145 square miles of roadways. A football stadium benefits the airport. It does. Because the visiting team fans will have to fly in and thereby use the airport to attend the games. Just about anything I can think of, you can spin into some kind of a benefit for the airport. So does that mean the airports are tax-free residents, utility-free residents? Not at all. That's what I'm trying to understand. Yes, not at all. Where do you draw the line? I draw the line where Congress draws the line. No, no, no. Congress delegated to the agency to come up with policies, to come up with guidelines. So it did. But they told the agency what needed to be in that policy. It hasn't amended the statute yet to say the agency's wrong. So that's what I want to understand, where you draw the line. Well, I draw the line, again, the Anti-Head Tax Act does allow for property taxes, use taxes, sales taxes, all kinds of taxes that people at the airport and airlines and airports pay. There's no question about that. And either you come within the Anti-Head Tax Act or you don't. In this case, they don't. Now, airports are generally monopolist. If you want to have an airport and serve it as an airline in Portland, this is the only game in town. So it's not like a Walmart who doesn't like its deal, it can go somewhere else. And Congress has legislated in this area to make sure that the airports that are getting all the funding they're getting from various sources use the funds for what they're supposed to use the funds for. May I interrupt you? Sure. That gets to a question I have about subsection B, and particularly B1. It says that taxes on aviation fuel and revenues generated by a public airport will be expended for the, et cetera, operating costs. First of all, who collects local taxes on aviation fuel? Typically a county or a state government. So does that mean that the county has to spend the revenue from the taxes on taking care of the operating costs of the airport? There's exceptions in the statute for state aviation program or noise mitigation, but it has to be an airport-related use. Okay. Second of all, and this gets to your remark that triggers this question on mine. It says revenues generated by a public airport have to be used for the operating costs of the airport. But grants, would federal grants be revenues generated by operating the airport? I would think not. No, they're not. So this is not a prohibition on using grant money for something else. That's entirely separate. That would be something separate. That's not what this language is going at. Okay. Where do the revenues generated by a public airport come from? Mostly the airlines. Concessions, aeronautical uses, primarily the airlines in this case. That's why they take this stuff so seriously and are concerned about the slippery slope. The other example Judge Randolph and I had was all the trees that fall down in the beautiful northwest. That's going to be the next bill given to the airport. We've got to clear those trees so they can get through the roadways. But, Judge Tatel, if I can return to your question. Before you leave that, B-1, what is the definition of an operating cost? That's what this case turns on, doesn't it? Well, no, Your Honor, we believe it turns on what is an airport operating cost, and then more importantly what is a payment that reflects value of facility and services provided to the airport. That's the key phrase. That's why it's not a Chevron case, for example, Your Honor, because all the FAA did is made a finding, which we don't think there's substantial evidence of, that there's value. The second component of value. Where do you get the value part of this? Sure. The C? No, 47107K2A. K2A. Right. Yes, I wanted to ask you about that, too, because that's funny you mentioned that. I was just looking at that provision because I'm still stuck on the statute and your argument that the activities that are funded have to be on the airport ground, so they can't be anyplace else. And this says payments reflecting the value of services and facilities provided to the airport. Right. It doesn't say where those services have to be. Congress could have said that, but it didn't. It just says, it doesn't say payments reflecting the value of services provided to the airport on airport ground. It doesn't say that. Well, and there is an exception for noise mitigation. They could use it to buy airtime. No, no, would you speak with me about that? We're trying to figure out the statute. Sure. Okay, that's where we have to start. And your brief argues, and you said this morning, that your position about the statute is that it can only, the money can only be used to fund services provided on the airport grounds. Right? Which I think is the same as to the airport. Well, I know you think that, but that's not what this says. To the airport could be read as a service provided to the airport on the grounds or a service provided somewhere else that is nonetheless a service to the airport. It's ambiguous. It isn't clear. I wouldn't say it's ambiguous, but I would agree that the statute, both 47133 and 47107, carve a limited exception for a noise mitigation program, for example. So you could buy a house a mile from the airport to make sure you don't have a problem with noise. So there is some attenuated example. Or a roadway, Your Honor, going to the airport could be. Suppose I didn't agree. This is a hypothetical. Suppose I didn't read the statute the way you did. Suppose I think that it does authorize expenditures, it does authorize airports to use these funds for services that are connected to the airport. Just assume I think that. Do you then lose the case? No. Does your case rise and fall on that? No. Because it's an issue of magnitude. Then what's your back-up argument? The airport, and that is going to be airport funds. There's going to be some envelope outside the airport we're all agree with. It's just the entire city of Portland and a Superfund store nine miles away. But that's not the argument. But that's too much. I didn't understand you making that argument in your brief. I guess I could understand an argument that, well, the airport is being required to pay a disproportionate share of these water and Superfund shares. But that's not the way I read your brief. Not on airport property, therefore they're not covered. Let me be really very clear then. Our position is that it has to be on the airport or dedicated to the airport, not some general for the community benefit that is not dedicated to the airport. So that is the clear distinction. And our brief tries to give examples of where it could be a roadway that is leading up to the airport. And where does that come from? Let's go back to the language of the statute. Sure. Show me where that comes from. That's actually in the FAA Revenue Policy Use Policy. That's where we got that from. So that FAA. To which provision in particular? Why don't you just find it and read it to us? If you want the provision in the Revenue Use Policy, I could. I think I may have it here. I believe it's Section 5-9, 64 Federal Register at 7718-19. What does it say? If I did the right one here, that would be, to the extent a roadway is dedicated to accessing an airport, the cost for that street could be paid for by the airport. The Revenue Use Policy states, airport revenue may be used for the capital or operating costs of those portions of an airport ground access project that can be considered an airport capital project. But even those costs would have to be strictly documented and dedicated to airport operations. That last part is not the quote. The rest of it was. So clearly FAA understands that if you have a roadway going up to the airport, that can be covered with airport funds, and we don't challenge that. But I also wanted to quickly get back to your question about the statutory construction. Even Randy Fiertz in his 2015 letter agreed with us that the value requirement was above what you needed on the operating costs of an airport. So you could have an airport operating cost. We think it's not an airport operating cost. But even so, you still have to find that the payment reflected the value of facility and services provided to the airport, which the acting associate administrator did not even reach that issue. She said, although the director had a statutory construction we disagree with, the actual decision maker in this case said we don't have to address that statutory issue because she found that there was value provided to the airport, and we do disagree with that. We think there's no substantial evidence of value provided to the airport. I think I'm at the end of my time. All right. We'll give you some time to vote. Thank you. May it please the Court. Caroline Lopez on behalf of the FAA. I wanted to just start with Judge Tatel's point that the FAA absolutely agrees that what the statute says is it has to be for value even if K2 does apply, as the FAA associate administrator found, even if it did apply, and that's, we think, the cleanest ground to affirm on here. Even if it did apply, the airport is getting value for services it receives that go to the airport, even though part of those services are for general expenses that may happen to geographically happen off of the airport. And really what this case boils down to here is that petitioner is objecting to two line items on the airport's utility bill, which the FAA recently found on this record was fine because the charges here are for routine operating expenses of the utility. They're not for sort of some far-flung thing that one wouldn't expect to be on a utility bill that are necessary to keep that utility running. And they're allocated using, as Judge Rogers was emphasizing, the same fair and transparent methodology that's used for all rate payers. So there's no concern about targeting airports, which is really Congress's main concern with these airport revenue division provisions. And in these circumstances and on this record, the FAA found that this type of routine cost was fine. And it provided three factors by which to evaluate both this particular situation and any future situations such as those brought up by Judge Randolph's hypotheticals. And they all point in the same direction here, which is that these routine expenses can be passed on. First, this isn't the classic inter-sponsor context in which there's simply nobody to raise an objection to the fee here. The court both participated in the hearings on setting the fees and could go, as the associate administrator emphasized, was the appropriate place to go to the state courts and the state municipal boards if they thought that this truly was unfairly allocated, which there's no indication that the airport is doing anything more than just paying its fair share of the cost that it takes to keep the utility running. Second, as I've just been saying, the rate methodology here treats the airport the same as any other rate payer rather than targeting it. And third, these two fees are actually conventional expenses of running a utility and therefore can be passed on to all of the utility's customers. And I'm happy to sort of go through each of those two fees because I think that might sort of clarify what that record actually should be. So first, for the off-site stormwater fee, it's a classic utility function to have to keep the public roads free and clear of flooding. And therefore, that's one of the determinations that the FAA made here is that therefore it's a general operating expense of running the utility that can then be passed on to all of its rate payers. And here it's undisputed that the port is at least a proper rate payer under the charter provisions. And that's because it undisputedly receives sewer and water services. And so the FAA reasonably found here that the utility can pass on the general and UT expenses that the utility needs to be able to keep running to provide all of its services to this... How is it allocated? How is the charge allocated? The charge is allocated using the impervious surface methodology, which is used by 90% of stormwater utilities. That's at JA290 through 291. And so it treats all rate payers using this uniform and transparent rate methodology that's used... On the basis of what, acreage or what? On the basis of, sorry? Acreage? On the basis of acreage, that's right. And that's a classic way, again, 90% of stormwater utilities use that. So there's no indication that they created this methodology to unfairly target the airport. In fact, the same methodology has been used based on two studies that the city did in the 1970s when it was first setting up the utility in the way that it's run now. And this city studied a variety of different allocation methodologies and found this one to be the most fair and transparent. And again, it's a routine methodology used throughout the utility. So you think the test is whether it targets the airport? Your Honor, I think that's one of the factors. So here, the FAA laid out three factors, again, all of which point in the same direction. So is it intrasponsor or not? And in the intrasponsor context, that's the classic context that Congress was concerned about. What does that mean? So that means where the person, the city that charges the bill, is also the same city that owns the airport and pays the bill. And the concern there is that the city hall is going to take out of one pocket and put into the other pocket. And that's not present here. So that's one of the factors. One of the factors is, is the rate methodology here, and this is a factor in the revenue use policy at 719 through 720, and it applies in the intrasponsor context too. It's a check on intrasponsors. Is the rate methodology fair so that everybody's just paying their fair share? Or is it something that you think is really targeting the airport? And then the third thing here. How do you determine fair? I mean, you know, one way of determining fair is that you're paying something that's equivalent to the value received. That's fair. So how do you define fair? There are two ways that the FAA – Is it just egalitarian? Is that your idea of fair? Your Honor, so two responses. First, on this record, Petitioner hasn't challenged that the allocation methodology itself isn't fair. So that question, the question of whether or not the FAA was correct in its assessment that this methodology is fair, hasn't been challenged in this appeal. But second of all, the FAA, both in its decision here and its revenue use policy, has talked about ways that you can think about whether an allocation methodology is fair. And this is, again, at 7719 through 7720. And that is, one, does the methodology treat the airport the same way it treats other comparable entities? And here, in fact, the methodology, because it's based on surface area, treats the airport like any other entity with similar surface area. It's not sort of something that says – So if it's the equivalency of value received, if everybody's being treated unfairly, then that's fair. Is that the idea? No, Your Honor. Of course the FAA would reserve the right, if there were some complete outlier fee, to treat the case differently. But just in terms of how it generally considers, as a factor, whether or not the methodology under which the airport pays out is fair, one is, is the airport treated the same as other similar entities? And another factor is, does the rate methodology relate to the cost of providing the service? And that's at 7720. And here, the FAA reasonably determined on this record that the costs were, in fact, related to providing the services, because these are the general expenses that the utility has to be able to continue to run. Counsel, Mr. Goldberg said there's no evidence in the record to support that. No, Your Honor. I respectfully disagree with Mr. Goldberg there. What evidence is there? So there's substantial evidence. So first, there's been no challenge to the general sort of legal concept that, or as applied to these facts, that providing stormwater facilities is generally a classic utility function that can be, that is generally passed on to its rate payers. Right, but their argument is, their argument, I think, goes in two steps. Number one, this is limited to, I think it's two arguments. Their main argument is, number one, limited to services provided on airport property.  And there's no evidence in the record that it benefits the airport. I understand Your Honor's question. So there are a number of findings, both general and specific to this factual situation that the FAA made. One determination that the FAA made is that the airport gets a benefit from the utility being able to continue to run, and that's because the airport undisputedly gets sewer and water services. So if the utility went out of business because it couldn't pay for its stormwater fees or it couldn't pay for its Superfund liability, then there'd be nobody providing these services to the airport. So the airport gets benefit that way. Second, petitioner statement that the FAA, that the record showed that no rainwater went past property lines, is controverted by the FAA's factual finding that, in fact, petitioner didn't... Katie, can I back you up a little bit on that? It bothers me on that. I just want to hear the answer to your question about the record. Go ahead, just finish that. So here the FAA found... So in the procedural posture of this case, it's petitioner's burden to show that there's been airport revenue diversion. And here the FAA found the petitioner did not, in fact, meet its burden to show that no airport runoff... You know, rainwater doesn't scratch property lines. The Port has disputed that none of its stormwater goes into the city streets. So FAA made that finding in this particular case. And then also, as Judge Rogers was mentioning earlier, the FAA also found that the airport receives benefits here because this particular airport is surrounded by city roads, and so it would be impossible to get to the airport without a helicopter. And that's supported in the record. How does any of that relate to the Superfund site? So, thank you, Your Honor. If I could just finish that one point about the roads, which is that that's further supported in the record at JA217, in which in the year 2015 alone, 8.3 million vehicles approached the airport terminal from those roads. So the airport is certainly receiving use. And one other thing, I just wanted to clarify, the portion of the revenue use policy that Mr. Goldberg was referring to had to do with the special restrictions on roads when the pot of money that the airport is using is not the airport revenue pot, but is the passenger facility charge pot. And that passenger facility charge has different requirements. I'm sorry, Judge Randolph. Would you mind repeating your question? We'll go on to the Superfund. Judge Randolph and I both had exactly the same question. How does this apply to the Superfund? Absolutely. So, with respect to the Superfund fee, this has to do with the fact that it's a general and routine, well, unfortunately, a general and routine expense of continuing to run a utility. There's no way for the utility to get out of its liability to the EPA for its historic pollution, which, by the way, is for both its stormwater system management and its historic sewer system, which, in fact, the airport does use. And so the utility has to be able to account for that liability in order to keep running. And the FAA here recently determined that one reasonable way to account for that is to pass it on to all its rate payers in a fair and transparent way. How does that benefit the airport? You know, when you're talking about the stormwater, and it's all about that they get dry roads and this and that and so on, how does cleaning up the Willamette River nine miles from the airport benefit the airport? Absolutely, Your Honor. So, it benefits the airport because the utility's ability to pay its Superfund liability allows the utility to be able to continue to run and provide all of the services that it provides, including the services that are understood. So, if a utility is running a deficit year after year, and they impose, and this happens, they impose a special assessment charge on all the people that use the sewer and the water and everything else, then even though they're the ones that are responsible for running the deficit, the airport can be charged for that, under your theory. Because otherwise, look, the utility may go under. Your Honor, I don't want to get out ahead of the FAA here. I do want to say that what the FAA would do in looking at that circumstance is, does this look like a real outlier cost, or is this something that we'd expect to see as a routine cost on the utility? For example, in your hypothetical, one thing that the FAA could look at is, is the reason that the utility was running a deficit because it wasn't charging its customers, including the airport, enough in prior years, for the services that it was receiving. So, I thought one other finding by the director was, it wasn't extensive, that the Superfund cleanup has the effect of cleaning up the air, and to that extent, the passengers and the employees benefit, Right. I mean, that is one of the findings of the associate administrator. We think the primary finding is that the payment of its liabilities for the Superfund site allows the utility to keep running and not charge it. How is that allocated? I was looking at it. Remind me how that's allocated. What's the methodology for that? So, it's allocated. I know the sewage is based on the previous. What's this based on? So, my recollection is that it's allocated through a combination of the impervious, through an impervious surface methodology, and also as a percentage of the other fees that the airport and all the other rate payers have. So, it's tied to the way they allocate the Superfund fee, in other words, is sort of using basically the same methodologies that they use to charge out their other fees. If the petitions were right here, what effect would that have throughout the rest of the country? Absolutely. I'm just curious. It's not on the record, but what effect would this have on? I mean, the effect that it would have is here, if airlines could challenge routine line items and require utilities to sort of parse out exactly how much value am I getting from this line item, as opposed to how much value am I getting from the combined utility bill, then that would mean that airlines all across the country. You know, it's $5,000 a month split among these airlines here, but what it would really mean is that airlines all across the country would start bringing these things into FERC, and that would create a terrible administrative burden for FERC, which was actually part of the director's determination. That discussion. And it would basically turn the FAA into a mini-FERC for airports, which would be enormously burdensome. And so here the FAA drew a reasonable line, which is to say where there are, of course, you would look at this if there were some crazy outlier on a utility bill, but where what you're talking about are sort of routine expenses that you'd expect to see on a utility bill. Of course the airport can pay that as part of its operating costs. I mean, we've all seen our own utility bills. I don't understand every single item on them, but I know that I'm getting value from continuing to receive those services. So let me understand your administrative burden argument. Utilities now are able to trace the amount of electricity to a specific site. Is the problem that the agency then would have to be an adjudicator of what is value, and that means a lot of experts? That's correct, and it would have to. So even on an electricity bill, for example, I believe somebody earlier brought up a hypothetical about, well, what if as part of ensuring that they could continue, the utility could continue to provide electricity, they built some new power lines, and then they put a charge for the cost of building that utility infrastructure? Then you would start to get into arguments about, like, oh, well, those power lines really were more to some other part of the city, even though, of course, we got the benefit of power lines that were slightly less burdened that are closer to the airport. And so what the FAA reasonably determined here is that it shouldn't be getting into the business of making those types of determinations, and really the appropriate place for that, as the Associate Administrator emphasized, is in the state and the municipal courts that deal with utility fees as sort of the first line of defense. And then if for some reason that doesn't work the way that it's supposed to, and of course the FAA reasonably presumed that those will work the way they're supposed to, and here in particular the FAA noted that some of the airlines that make up Petitioner's Group have their own separate utility bills just because of the way they happen to operate at the airport, and none of them have challenged the reasonableness or unreasonableness of that. Doesn't the FAA have to make evaluations of the relationship of a particular service to the value of the, you know, what value it is to the airport? Doesn't it have to do that under K-2 anyway? Except for, you know, put aside utility costs, there are all kinds of other charges, and K-2 requires the FAA to prohibit charges that don't relate to, that don't cover value to the airport. It has to do it anyway. So here the Associate Administrator in fact did make a K-2 determination, and we think that the decision should be based on that K-2, should be affirmed based on that K-2 determination, which was that in fact the airport did receive value for all the reasons that we've been talking about. The airport undisputedly receives sewer and water services from a utility, and these costs are necessary to keep that utility running and able to provide those services. My theory was that if they didn't pay, if the airport didn't pay these charges, that the city would cut off the sewer and water? I recall seeing that. That's correct. But here's the problem I have with that rationale. If the city was imposing charges that were illegal under the statute, and then the city cut off the sewer, then they could be enjoined from doing that, couldn't they? No, Your Honor. They couldn't be enjoined directly. And I do definitely want to clarify this point. So the provision, section 4711F, that Petitioner relies on, allows for the FAA to get injunction relief for violations under this chapter. And so that really depends on the interpretation of whether, under Petitioner's theory, 47107B and 47133A run directly against the city municipality, even though the city municipality isn't the person in receipt of the airport revenue. And if I could just break that down, basically the way that those provisions work, which are materially identical for purposes of this question, is that with the one exception of aviation fuel proceeds, how a city or a state uses money that the airport has paid it simply isn't regulated by 47107B and 47133A. If those provisions instead specify how proceeds... But the charges that the city imposes on the airport are regulated. And this is a regulation of interstate commerce. And if the charge that a city imposes on an airport is one that's preempted because of this statute, the city is acting illegally. Your Honor, what the statute controls is not whether or not the city can impose either the aviation fuel tax in the first place or a utility fee in the first place. What the statute prohibits is the use of the airport sponsors, which pot of money the airport sponsor takes out of. And so the FAA could issue an order directly... If it did not think, contrary to the record here, the FAA did not think that the airport was actually getting value for paying its entire combined utility bill, the FAA could order the airport, listen, you figure out how you're going to pay or not pay your combined utility bill, but you can't take it out of the pot of money that is airport revenue. Now, what FAA couldn't do, because the statute doesn't regulate directly the state or city's conduct here, is say, state, you can't continue to charge that. Or state, you have to, in fact, continue to provide services, even though you're not getting your bill paid. I see I'm over my time. Just one more thing. I suppose since... I suppose the FAA also has the authority to terminate funds to an airport that is using its revenues for an improper purpose, too, right? That's correct. Because these are conditions of grants, right? That's correct. Okay. If there are no further questions, we respectfully ask that the Court affirm the FAA's decision here. Thank you. Counsel for petitioning. Thank you very much, Your Honors. First point, ADD 47, the language from the FAA 1999 policy, has nothing to do with PFCs. It's Section 9 PFCs. Counsel for the government said that when I talked about the airport roadway situation, I was referring to passenger facility charges. I wasn't. No, she said that's what that provision is about. Right, but that's not. She didn't say you were talking about it. She said that provision is about what you call a PFC. There's other provisions that deal with PFC. But not this one? Not this one. So if I go and read this, it will be obvious to me that it doesn't deal with PFC. It's obvious to me, Your Honor. It's ADD 47, Item 9. It's the list that's there. If I'm wrong, I stand corrected. But it's confusing because there are limitations on PFCs, but this particular provision I do not believe is. So you're relying on, just tell me once again, exactly what? On ADD 47, it's Paragraph 9 in the Revenue Use Policy from 64 Federal Register at page 7717-7718. We think that's an example of where the FAA has recognized you can pay part of a roadway expense, but it has to be for the airport. Judge Randolph, we completely agree with, I think, how I would interpret your statements. When the FAA says, well, you have to pay that bill, because otherwise they'll shut off unrelated services for sewer and stormwater. Not stormwater. Sewer and regular water. That is economic duress, frankly, and that is not valued. Now, we do very much disagree with my learned colleague. Section 47133, that statute, 49 U.S.C., is not limited to airport sponsors. And in the tax area, the FAA has gone on record and said, state and local governments, you must use that money that's tax revenue for airport purposes. And if you don't, we will sue to enforce you, to enforce that. There's no distinction in 47133 that would say to the FAA, but you can't use that authority for the first part of 47133, which relates to airport revenues. And any argument is counsel argument in the briefs. It's just post hoc. It's nothing that the FAA has done. What about the acting administrator and the director's point that you have remedies at the city and local level? I'm glad you raised that. We sued the city three years ago, and the judge in that case said we didn't have standing because of our problems with the FAA and the airport. Now, he did say something that was very interesting. He said, you know, Port of Portland, you've got 40. Who's he? The judge. I'm sorry. What judge are you talking about? What claim were you talking about? Sure. It's in the related case materials here. When we had this problem, we left no stone unturned. We filed our Part 16 after trying to get it resolved for five years, and we also went to the United States District Court in Portland, and we sued the city. We couldn't sue FAA or the port because our remedy was what we're doing here. And the judge, without going to the merits, and this is referenced in the related case. You couldn't sue the port because? For the grant assurances we needed to go through the FAA. Okay. But that's a different issue, isn't it? Right. We could sue the port because the port is the one who has agreed with the city or commented on the city and the local rates. But our problem with the rates is that they violate federal law. We're not arguing a state law issue. I thought you were saying you're not getting any value. We're not, but that's not the state standard. The state standard is reasonableness or something like that, which I don't even know what that means, and we're not here on that. Reasonableness, you don't know what it means. Well, a typical rate case reasonableness. That's not the standard that the Congress has applied for airport revenues. I see. So you've lost your local remedies. We didn't pursue them. Well, you've lost your local remedies or you chose not to sue the port, and so your claim here is simply Congress has said this is an unlawful charge. Well, we sued the port. They are the respondent in the Part 16, so they simply feel like we sued them. But we also sued the city separately, and the judge there said we had no standing because our argument was with the port. I only know what you said, counsel. You said you didn't sue the port in any event. So you're left to this petition or you go back to Congress. We don't have the district court. That's exactly right. Right, okay. Yeah. And the other thing I wanted to understand is back on Judge Tatel's question, suppose you prevail here, then what options are available to the city? It has a landowner among it. Does it just reassess your property? Property taxes are certainly something that are allowed, certainly other taxes. That's right. There are other ways the city can deal with its needs. So those are taxes that the port would pay? Yes. And then what would the port be able to pass on to the airlines? I don't know, Your Honor. The answer you would say to me is nothing because you get no value, right? It all depends on how it's structured. This is a payment that is going to an outside vendor, if you will, that is not reflecting the value of the services and facilities provided. If it was a tax issue, that's a different issue. It's not before the court. There are ways maybe to structure it or maybe not. I honestly couldn't tell you one way or another. No, but just hypothetically, suppose your members are going into a new jurisdiction and that jurisdiction says, we're going to pass a statute that authorizes a port authority to run the airline's operations in our jurisdiction. Are you saying that... I just want to understand the economics of it. Sure. The state says it's okay with us, but we want the port to set the terms. What are you saying the port cannot do in terms of charging your members? Well, they can't charge a fee that violates the revenue diversion statute. Taxes are a different matter. Those are political. And one of the reasons why revenue diversion has been a problem is because local governments have gotten away from politics by just imposing a fee as opposed to a tax, which has political connotations. So you're saying the port still could not charge utility fees? Well, they could charge utility fees for utilities provided at the airport and to the airport. Yes, they certainly can do that. On the airport land? To the airport, which I just think is very similar to on the airport with some limited exceptions, but it cannot mean the entire city of Portland. It cannot mean... Even in an allocated... Yes. Sense. Right, because it means to the airport or on the airport, but it doesn't mean to the entire community, and oh, yeah, the airport is part of the community, so therefore it's okay. No, but you're not paying the entire community. I mean, that's what this allocation methodology is designed to address, and you haven't challenged the methodology. That's what I'm trying to explain about this case. But the only reason why we're paying it is because we're in the community, not because it's a service that's being provided to the airport, and that's the problem. But you have 3,000 acres of the city of Portland. Small compared to the entire city. And you're only paying a small part. According to the record, you're 0.33% of the city, and you're paying, once the credit is given to the port, 0.33% of the charges. No, we're paying 100% of the charges for the services provided to the airport. All the stormwater, we're paying for it. But that is not the same as the services provided to the entire city. Exactly. It's this 0.33%, which is basically your acreage. But then when we go to all the timber that's falling down on the trees, the lighting, everything. We're not getting timber. But that's what it is. That's what the slippery slope is. I don't know, but I understand slippery slope. Right. But courts only deal with what's before them and what you've challenged, and you've challenged two line items in your utility bill. But they have a huge financial magnitude for the airlines at Portland. This is that small routine. We would also add, Your Honor, that we did have an expert. You know, we had three experts. You know, you can't leave poverty. All right? So let's not go down that road. No. Fairness and what the law requires is what we're going to put you down. No, exactly. That's what I'm trying to understand, exactly what your position is on this. You have not challenged the methodology. As a general methodology, citywide, we haven't challenged it. That's right. And the methodology has an allocation formula. But it allocates something that we're not using, and that's the problem with it. It only allocates, on the basis of the formula, what I will call your percentage share. It's a formula that violates the statute. Like, Ramsey Pricing violated the statute in the overflow case. Because you don't use sewer services at all. Stormwater. No, the stormwater services we don't use at all. That's right. But you have this concept of a sewer system as not involving stormwater. That's what I'm not. I mean, the city here, for example, is spending tons of money, and everybody's rates have gone up, to address these stormwater issues as part of utility operation. I mean, it's all meshed together. That's what I can't understand. You want to be an island, sort of. It almost is an island, actually, the way it's on the Columbia River. We pay for our stormwater. We don't use the offsite stormwater, so we shouldn't have to pay for it. And it doesn't matter what's reasonable or not. When you say we pay for it, what do you mean? I'm sorry, the airport and the airlines pay for all their stormwater to the Multnomah Drainage District. What assurance do you have that if you prevailed, and the port didn't have to pay the charges for the stormwater and the Superfund, that it would thereby reduce the expenses to the airlines? Airports require money to operate, and if you can't use $4 million, $10 million, whatever it is a year, because you're paying it to the city of Portland, then you've got to go somewhere else, and that typically would be airlines. But what assurance do you have that the port would reduce the fees to charge that the airlines would pay? Well, they have to, because these are cost-based fee structures, and the only way that the port can get away with it now is to say, well, we have to, our hands are tied, and the FAA is letting us do it. What statute requires them to reduce the fees? The statute that requires them to reduce the fees would be, it wouldn't be a statute, it would be, in the first instance, it would be the lease that these carriers have, but that's based on federal law that requires airport charges for aeronautical and uses to be cost-based, unless they're agreed to voluntarily by the parties to some other methodology. But generally speaking, fees have to be cost-based at airports, because airports are special, and they're like monopolies, and they're, you know, something that Congress has had to step in to make sure that airlines are paying fair fees. So I believe it's undisputed that if this court was to tell the FAA, you know, with all respect, you're not complying with the statute, you need to tell the port that they can't use airline and other airport-generated revenues for this, then, you know, the port, first of all, has $60 million a year in non-airport fees, according to the decision in the Portland case that's, again, cited as a related case. So if they want, they can find the money. This is the district court? Yes. So if they want, they can find the money to pay. We believe, though, fully, that the FAA has full authority. That's a totally unsupported statement. It's in the record. It's in the decision that we cited. No, no, they've got $60 million. It doesn't mean they don't have $60 million. That's a fair statement. That's what the judge said. That's all I'm getting at. Yeah, no, that's true. That's true. But what the judge said there is they're a massive entity with lots of resources. Frankly, we're not saying that they should have to do that. I would say that the city is wrong here, and the city is the one that needs to be told that the law says airport revenue stays on the airport, and, you know, find another way if you want to do this. But that's not the remedy you could conceivably get here, right? Yes. The only remedy you can get here is a remedy that would prohibit the airport, the airlines, from spending these monies on the utility bills, right? Right. The remedy we want is. That's the only thing you can get from this Court. All we want is for you to direct the FAA to comply with the statute. No, but I know, but that means. No, the remedy says fatal. That means, aren't I right, that that means that I'm just picking up what you said earlier. Sure. That just means that they can't spend these monies on the utility bill. They'll have to either convince the city not to charge them, or they'll have to pay for it out of some other funds, right? But they can't. The FAA will prohibit. All it can do is prohibit the airlines from spending this money, right? The FAA can direct the Court not to spend the airline money for this. That's right. That's it. Okay. Yes, but if the FAA. No, I understand. That's not an insignificant remedy. Yes, it is. That's the remedy you want. That's the remedy we want, but we don't buy this. Oh, my gosh, if we fine for the airlines, then all the sewer and all the water is going to get cut off, and this terrible thing is going to happen. I know you don't buy that, but that's not the implication of Judge Tatel's question. All right. Very well, Your Honor. Yeah.  Thank you. We will take the case under review. Thank you, Your Honor. Stand at ease.
judges: Rogers, Tatel, Randolph